JANVIER, Judge.
Munson Hickman, an employee of Neeb Kearney & Co., Inc., on November 13, 1952, during the course of his employment in the hazardous business of his employer, sustained injury in an accident which arose out of the employment. On January 10, 1953, he was discharged by the doctors of his employer as able to return to his former employment. All compensation payments which were due up to that time and all medical and other expenses were paid by the employer or its compensation insurance carrier, The Fidelity and Casualty Company of New York.
On May 27, 1953, Hickman, alleging that as a result of the accident, he had been totally and permanently disabled, brought this suit against his said employer and its compensation insurance carrier, claiming maximum compensation of $30 per week for 400 weeks, together with certain penalties for delay and attorney’s fees. From a judgment dismissing his suit, Hickman has appealed.
At or about the time alleged, plaintiff admittedly sustained an injury to his left wrist when a piece of timber fell upon it. He was sent to the office of Dr. Joseph C. Menendez and examined by an associate and, on the next day, he was examined by Dr. Menendez, who discovered that, while the accident had caused some injury to the wrist, the more important fact was that Hickman was suffering from a “cold” or preexisting ganglion which should be surgically removed and which was removed by Dr. Menendez on November 17, 1952.
It may be well to state here that, although Hickman admits that the ganglion was surgically removed, he denies that the operation was performed by Dr. Menendez.
Hickman remained under treatment of Dr. Menendez until January 10, 1953, when he was discharged as able to return to his former employment. However, he felt that he was still disabled and during the several months from February 19, 1953, until October 19, 1953, both before and after the filing of this suit, he was examined by other orthopedic experts and on several occasions X-ray photographs were made. On February 5, 1953, he was examined by Dr. Salatich, who later gave testimony as a witness for plaintiff and who stated that Hickman denied that he had had any previous injury to the wrist and who said that, in his opinion,
“this patient was unable to carry on any physical activities which would impose with any undue degree of strenuousness on his left upper extremity, with specific emphasis made on the left wrist, especially if such activity requires any undue amount of effort and exertion.”
In August, 1953, Hickman went to Dr. Arthur N. Houston, admittedly an expert in the field of “industrial medicine and surgery”. That visit was made because of a second accident while Hickman was in the service of another employer. We quote the following from Dr. Houston’s testimony:
“ * * * I believe he said, ‘I been rolling a truck, a hand truck, with a bale of paper on it, and something obstructed one of the wheels of the truck, and kicked the handles of the truck upward,’ and that he had pain in his wrist following this. He followed this rather quickly with the statement that he had been previously injured and that he did not consider the injury of the moment to be the cause of the disability — that he had been injured on November 13, 1952, while working for Neeb & Kearney, and that he had struck the back of his hand at that time.”
Dr. Houston found the scar which had resulted from the operation which had been performed by Dr. Menendez, and he said that, except for this scar on the left wrist,
“the left wrist, itself, did not appear different from the right, though there *137 did appear to be a slight swelling in the lower third of the left forearm over the dorsoradial surface, which I took to be along the course of the extensor carpi radialis tendon. * * * ”
Dr. Houston made various tests and said that he had had Hickman grip his hands and that the grip showed a marked difference between the left and the right hand, but he added,
“I could not justify the difference in the grip of the two hands on the muscular condition of the two arms, as the measurements showed there was not sufficient atrophy of disuse to justify the weakness of grip which the patient demonstrated.”
Evidently Dr. Houston felt that Hickman intentionally failed to exert the same effort when he gripped with the left hand.
Dr. Houston stated that he did find on the bones of the left wrist osteophyte formation and there is no doubt that there was such formation, for all of the other doctors stated that they found it, but the evidence convinces us that, as stated by Dr. Houston, osteophyte alone would not indicate disability and, as stated by almost all of the doctors, osteophytes are very frequently found in persons of Hickman’s age group, he being fifty-one years of age.
After testifying at considerable length, Dr. Houston, who had been placed on the stand as a witness for plaintiff, stated that he found no difference between the muscular development of the two hands and arms, and he further said that if the left hand was in fact so injured that it could not exert a firm grip, atrophy would have resulted and that he found no atrophy.
Dr. Menendez, who first treated Hickman and who, in spite of Hickman’s statement to the contrary, was evidently the surgeon who operated on his hand for the removal of the ganglion which it is now admitted had existed before the accident of November 13th, 1952, said that after the ganglion had been removed, he found nothing that should disable plaintiff;
“ * * * I established satisfactorily in my mind and convinced myself that he could return to work, because the incision and the operative procedure had healed. Naturally, the scar was approximately six weeks or seven weeks old, and Hickman being right-handed, and this condition being on the left, certainly, in my opinion, he could have returned to work, because it would be equivalent to occupational therapy, and naturally he would rehabilitate himself and no harm would ensue.”
Dr. Joseph B. Merino, an expert radiologist placed on the stand by defendants, stated that he had made X-ray photographs of both wrists of plaintiff and, when asked to compare the condition of the two wrists and to state whether he “could see any difference at all * * * ” and whether there was “any evidence of any pathology or injury or damage to the left wrist as contradistinguished from his normal bone structure in the right wrist,” said that the X-ray examination had shown no real difference but that if there was some slight difference “ * * * it would be on the ulnar surface of the lunate bone, which is not the wrist in question.”
Counsel for plaintiff makes much of the statement made by Dr. George Battalora, admittedly an orthopedic expert, to the effect that he thought that Hickman had sustained a ten per cent disability in the use of his left wrist. It appears that Dr. Battalora did not examine Hickman until April 13, 1953, and that when he did so he obtained a history of Hickman to the effect that a bone had been injured and that a fragment of bone had been removed from the left wrist. When Dr. Battalora was told that the actual fact was that there had been no removal of any fragment of bone, and was asked whether his opinion as to disability would have been the same had he known that there had been no such bone fragment removed and that the operation had been for the removal of a ganglion, he . said:
“ * * * I would probably have stated that I thought he had a ten *138 per cent loss of use of that left hand at that time, but that, within a reasonable period of time, that should clear up. Now, if he had had a fracture, with a removal of the bone, that would have been a permanent impairment of -''one of the joints of the wrist at least, and that would, of necessity, have caused some anatomical derangement in the wrist, which could cause, disability. But since he didn’t have that, it is a different proposition.”
There is testimony of certain lay witnesses, — a sister of plaintiff, friends of plaintiff, and another who had" been a fellow employee when Hickman was working for the other employer at the time of the occurrence of the second accident. All of these witnesses, without being specific as to when or for how long they had noticed evidences of injury to plaintiff’s wrist, nor as to which wrist it was which had been injured, did state that they had noticed on different occasions that plaintiff’s wrist sefemed to pain him. This evidence, however, must yield to the overwhelming evidence of the doctors which, in our opinion, very substantially preponderates to the effect that the injury which plaintiff sustained while in the employ of defendant, Neeb Kearney & Co., Inc., was merely to the soft tissues of his hand and that the resulting disability continued for a very short time.
It may be significant that, although at tire request of the attorney who then represented him, Hickman was examined by Dr. Irvin Cahen, another orthopedic expert, Dr. Cahen was not called by plaintiff as a witness.
Counsel for plaintiff is rather critical of the action of the District Judge in refusing during the trial, on one occasion, to examine the wrist of plaintiff and to state in the record that it was obviously swollen.
Counsel for defendants stated' in argument that if the wrist Of plaintiff at that time" was actually swollen, he certainly did not notice the swelling and the Judge’s statement on that occasion'- is, we think, significant. ' It seems that on the previous afternoon, the District Judge had been asked to examine plaintiff’s wrist* Evidently he noticed no swelling at that time. Dn the next morning counsel for the plaintiff asked the District Judge to again examine plaintiff’s wrist and the District Judge, in refusing to do so, made the following statement:
“I am not going to state anything for this record other than the fact that on yesterday afternoon at a few minutes after 4:00, when the case was recessed until this morning, for trial, Counsel for the Defendant asked me to take a look at both wrists of the Plaintiff. I did, and at that time there was no swelling in either wrist or forearm or the back of either hand. Counsel for plaintiff this morning requests the Court to take a look at the left hand of the Plaintiff to determine whether it shows any swelling now. The Court doesn’t know the activity of the Plaintiff since the adjournment on yesterday, and will ask Counsel now whether any doctors in this matter are going to be present and testify in this matter.”
After a careful study of the testimony of all of the doctors and of the testimony of the lay witnesses as well, our conclusion is that plaintiff sustained the injury on the day in question; that that injury was to the soft tissues of the wrist only and not to the bones; that previously plaintiff had developed a ganglion; that all of the doctors agree that a ganglion requires considerable time to develop and does not result from a single trauma, and that when the plaintiff went to Dr. Menendez as a result of the slight injury which he had sustained, Dr. Menendez found the preexisting ganglion and removed it and that if plaintiff later found himself unable to fully use- his left wrist, that later disability did not result from the accident of November 13, 1952.
The- judgment appealed from is affirmed at the cost- of appellant.
Affirmed.'